IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

YANCY LYNDELL DOUGLAS,    )
       )
    Petitioner,    )
       )
vs.    )    Case No. CIV-02-101-C
       )
MIKE MULLIN, Warden, Oklahoma    )
    State Penitentiary,    )
       )
    Respondent.    )

## MEMORANDUM OPINION

Petitioner, a state prisoner currently facing execution of a sentence of death, appears with counsel and has filed his *Second Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254 By a Person in State Custody* (hereinafter "Second Petition"), challenging his conviction in the District Court of Oklahoma County.   Respondent has responded to Petitioner's Second Petition, the state court record has been returned from the Tenth Circuit Court of Appeals. and Petitioner has replied.[1]

A.    **History of the Case**

Procedural History

Petitioner was convicted by a jury in the District Court of Oklahoma County, State of Oklahoma (Case No. CF-93-3926) of one count of first degree malice aforethought murder for the shooting death of Shauna Farrow and one count of shooting with intent to kill for the

---

[1] The trial transcript shall be cited as (Tr., Vol. __, p. __.).

shooting of Derrick Smith.  The jury found the existence of two aggravating circumstances and returned a recommendation of a sentence of death for the murder and a sentence of life imprisonment for the shooting.

After denial of relief on direct appeal and on post-conviction in state court, Petitioner filed his original Petition with this Court, Case No. CIV-99-75-C, asserting ten separate grounds for habeas relief.  In its Memorandum Opinion and Judgment dated January 10, 2001, the Court denied relief on all grounds.  Petitioner appealed to the Tenth Circuit Court of Appeals.  During the pendency of his appeal, Petitioner filed a motion and an application for leave to file a second or successive habeas petition.  Permission was granted and Petitioner's appeal was held in abeyance during the pendency of the present case.

Petitioner now raises two related and intertwined grounds for relief:  (1) that his convictions were obtained upon evidence known by the prosecution to be false in violation of Napue v. Illinois,  360 U.S. 264 (1959), and the Fourteenth Amendment, and (2) that additional suppression of exculpatory evidence rendered his convictions unconstitutional. Petitioner's claims originate from affidavits executed in 2001 and 2002 by Derrick Smith. The affidavits recanted his trial identification testimony of Petitioner (and also of Paris LaPriest Powell) as one of the shooters and his identification of the car from which the shots were fired.  Petitioner also supported his claims with affidavits of two other witnesses who attested that they were threatened and intimidated by the prosecutor (Brad Miller) to testify falsely in their identification of the car used in the shooting as the car in which they had

previously seen Petitioner. Petitioner requested to be allowed to conduct discovery and requested an evidentiary hearing in order to more fully develop and support his claims.

The Court entered its Order holding this case in abeyance pending exhaustion of Petitioner's claims in state court. On remand, the Oklahoma Court of Criminal Appeals (OCCA) applied its Rule 9.7(G)(3) and denied review of Petitioner's claims. After supplemental briefing by the parties on the adequacy of the state's procedural rule, the Court entered its Order determining the state's procedural bar to be inadequate to bar review under these circumstances. Petitioner's requests for discovery and for an evidentiary hearing were granted. The Court held an evidentiary hearing in conjunction with an evidentiary hearing in the case of <u>Powell v. Mullin</u>, CIV-00-1859-C.

<u>Findings of Fact</u>

From the evidence presented and the testimony received at the evidentiary hearing, the Court finds the following as facts pertinent to the determination of the claims raised by Petitioner.

1.      Shauna Farrow was killed and Derrick Smith was shot on June 24, 1993.

2.      In an unrelated case, Derrick Smith pled guilty on February 1, 1994, and received a sentence of ten years in CF-92-6772. The plea was part of a plea bargain in which his trafficking charge was reduced to Possession with Intent and a prior charge of throwing an object from a moving vehicle (CF-93-6724) was dismissed.

3.      On June 2, 1994, Derrick Smith was released on pre-parole status under the supervision of the Department of Corrections.

4.      On September 6, 1994, Derrick Smith was arrested for receiving stolen property and was re-incarcerated on October 4, 1994, at Ardmore CTC.

5.      On May 25, 1995, Brad Miller wrote a note in the District Attorney's file stating he had spoken to Derrick Smith on the murder case.  (Pet. Ex. 39.)

6.      Petitioner's jury trial began June 20, 1995.

7.      Derrick Smith testified in Petitioner's trial on June 22, 1995.

8.      On June 23, 1995, Writs of Attachments were issued for Jackie Laster and Andrea Laster for failure to appear on June 22, 1995, as per subpoena.  (Pet. Ex. 16 and 17.)

9.      At the conclusion of both stages of Petitioner's trial, the jury recommended death on July 6, 1995, for the murder of Shauna Farrow.

10.      On July 7, 1995, Brad Miller wrote a letter to the Oklahoma Pardon and Parole Board.  The letter noted Derrick Smith's incarceration for a ten-year sentence for Possession of Cocaine with Intent to Distribute, and outlined a brief description of the facts of the shooting of Derrick Smith and the murder of Shauna Farrow.  The letter concluded:

> As you can see by the sentence Derrick received, this office gave him no special treatment in his case.  However, he was required to testify at preliminary hearing and the trial of Yancy Douglas.  He has done so without complaint.  In fact, he has fully cooperated and truthfully testified in both instances.  He did so in the face of repeated threats, both direct and indirect, from gang members.  This has occurred on the street and in prison.

Derrick stood up like a responsible citizen during the Douglas trial, which only concluded yesterday.  He was motivated to assist because of the wrongness of Shawna's death.  Without Derrick, Douglas would probably not have been convicted.  Douglas was sentenced to death by the jury for his part in Shawna's murder.  Derrick understands that he will be required to testify in Paris Powell's trial in September.

I have no agreements with Derrick.  However, I have spent many hours with him.  He is not a perfect citizen.  However, based on my experience with him, I believe he has earned an opportunity to reintegrate into society.  Ideally, he will be paroled to another state to live with family.  On the short term, I urge the Board to grant his pre-parole status.

Thank you for undertaking your difficult tasks.  If I can provide further information or be of assistance, feel free to call.

(Pet. Ex. 2A.) (This letter was first obtained by Petitioner's counsel on March 26, 2004, from the Oklahoma County District Attorney's Office case file:  *State of Oklahoma v. Paris LaPriest Powell and Yancy Douglas*, CF-93-3926.)

11.     On October 24, 1995, Derrick Smith was granted pre-parole status and released.

The following events began almost two years after the conclusion of Petitioner's trial and continued during and after Paris Powell's trial:

12.     On April 9, 1997, subpoenas were issued and served on Andrea Laster, Jackie Laster, and Tiffany Laster in Judge Black's courtroom, first ordering them to appear on April 23, 1997 (Pet. Ex. 24, 26, and 28), and also ordering them to appear and testify at Paris Powell's trial on May 5, 1997 (Pet. Ex. 23, 25, and 27).

13.     On April 20, 1997, Derrick Smith wrote a letter to his mother.  The envelope listed his return address as an inmate at McAlester, Oklahoma, Department of Corrections.

5

What's up Momma?  Have you been calling Cuz?  Probably not man call O
Dude and get that hook up to where I can come home from the county jail or
tell him he's short because I ain't gone let him put me in the cross again like
he did last time, but he ain't gone to do shit if ya don't continue to call him and
let him know what's going on, it's fifteen days before the trial starts and I
don't wanna be up in that county jail if he ain't talking write.  Tell'em I want
365 days for helping the state to kill some body cause that's what he plans to
do.  Plus send me some money daddy was suppose to have sent 25 dollars 3
months ago & nigga ain't got no money but Ima let you'll go.  Stay own brad
miller and I'll Holler at you'll later.  Love darric.

(Pet. Ex. 2B.)  (This letter was first obtained by Petitioner's counsel on March 26, 2004, from

the Oklahoma County District Attorney's Office case file:  *State of Oklahoma v. Paris*

*LaPriest Powell and Yancy Douglas*, CF-93-3926.)

14.     On April 23, 1997, a telephone call note reflects a phone call was placed to

Brad Miller from Marcella Traywicks (Derrick Smith's aunt).  Although Marcella Traywicks

believes she did not make that call, her testimony was that her sister, Derrick Smith's mother,

often used her phone and her name when doing so.  On the note Brad Miller wrote "Warden

Ron Ward" and "Derrick Smith," and notes "coop credits" and "with credits ➡225 days =

11/11/97."  (Pet. Ex. 2C.)  These notes memorialize a telephone call he had with David

Petite, sentence administration auditor at the Department of Corrections.  (This note was first

obtained by Petitioner's counsel on March 26, 2004, from the Oklahoma County District

Attorney's Office case file:  *State of Oklahoma v. Paris LaPriest Powell and Yancy Douglas*,

CF-93-3926.)

15.     On or about April 30, 1997, material witness arrest warrants for Andrea Laster and Jackie Laster were filed that had also been previously issued by the district court on April 9, 1997.  (Pet. Ex. 21 and 22.)

16.     On May 1, 1997, Paris Powell's trial began, ending on May 20, 1997, with the jury recommending a sentence of death for the murder of Shauna Farrow.

17.     On June 22, 1997, Derrick Smith wrote a letter to Warden Bobby Boone inquiring if Brad Miller had contacted him about 200 merit days and 400 lost credit days. (Pet. Ex. 1B.)

18.     On June 27, 1997, Warden Bobby Boone responded by letter to Derrick Smith. The letter stated that Warden Boone had been called by Brad Miller regarding Mr. Smith's situation, but that Mr. Miller was mistaken and meritorious earned credit was not intended as a reward for testifying in a felony case.  (Pet. Ex. 1C.)

19.     In August of 1997, Derrick Smith was discharged from the Department of Corrections.

20.     Derrick Smith was arrested for the October 17, 1997, shooting of Joe Shells and was charged with Assault with a Dangerous Weapon, CF-98-1545.  On July 30, 1998, the case was orally dismissed by Brad Miller.  On August 18, 1998, the case was formally dismissed by Brad Miller for the stated reason of insufficient evidence of identification. (Pet. Ex. 3.)

21.     On February 16, 1998, a drive-by shooting was allegedly committed by Derrick Smith as per the information filed in CF-98-1162.  On September 28, 1998, the charges were dismissed due to uncooperative victims.

22.     On May 17, 1999, Derrick Smith allegedly committed an assault and battery with a dangerous weapon.  He was later convicted of beating Amber McPherson with a baseball bat on January 22, 2001, case number CF-99-3338, and sentenced on March 14, 2001, to fifteen years.

23.     On March 8, 2000, Derrick Smith was arrested for trafficking in crack cocaine. On March 16, 2000, Derrick Smith and Andrea Laster were charged in case CF-00-1683. On October 24, 2000, Mr. Smith's attorney learned of a five-year deal in that case to run concurrently with a fifteen-year sentence in case number CF-99-3338.  On January 4, 2001, Andrea Laster received a deferred sentence.  On March 21, 2001, Derrick Smith received a five-year sentence to run concurrently with the fifteen-year sentence in CF-99-3338.

24.     On June 10, 2000, a murder was committed in Wichita Falls, Texas.  Derrick Smith was arrested on a Texas murder warrant on July 20, 2000, while in the Oklahoma County jail.  He was indicted for the murder on October 18, 2001.  On December 18, 2002, he pleaded guilty to an amended charge of aggravated robbery and received a twelve-year, six-month sentence to run concurrently with any sentence imposed by the State of Oklahoma.

The following testimony was received at the evidentiary hearing held in this case and in the related case of Powell v. Mullin, CIV-00-1859-C.  Evidence was presented and testimony was received through fifteen witnesses.  Of primary importance to the issues

before this Court was the testimony of Derrick Smith and Brad Miller (the prosecuting attorney in Petitioner's trial and in the trial of Paris Powell).

25.    Derrick Smith executed his first affidavit on May 17, 2001.  It is a handwritten affidavit recanting his trial testimony identifying Petitioner and Paris Powell as the shooters, recanting his identification of the vehicle from which the shots were fired, and recanting his trial testimony denying any deals or special consideration in exchange for his testimony. (Pet. Ex. 4, Attachment A.)  On May 24, 2001, Mr. Smith executed a second affidavit essentially identical to the first.  (Pet. Ex. 1.)  On January 17, 2002, Mr. Smith executed a third affidavit confirming his trial testimony and recanting his previous affidavits.  (Pet. Ex. 5.) On May 16, 2002, Derrick Smith executed yet another affidavit, recanting his recantation contained in the third affidavit, contending investigators for the State of Oklahoma threatened him with perjury charges if he did not "take back" what he had said in the first two affidavits. (Pet. Ex. 6.)

26.    Derrick Smith testified that everything in the handwritten affidavit dated May 17, 2001 (Pet. Ex. 4, Attachment "A"), was true.  He stated he was unable to identify anyone in the car on June 25, 1993, because he was high on marijuana, drunk on Everclear (grain alcohol), and because it was dark outside.  He attributed his initial identification of Paris Powell to the police officers as a statement based on what someone said at the scene, and not on his own identification.  He stated he told Brad Miller that he could not identify either defendant and that he would not testify unless Mr. Miller helped him on his pending drug trafficking case.  According to Mr. Smith, Mr. Miller told him that if he would testify and

9

identify Yancy Douglas and Paris Powell, Mr. Miller would assist him after the trials were over.

27.     Derrick Smith also testified that his trial testimony in both trials identifying Petitioner and Yancy Douglas as two of the individuals shooting from the car, identifying the car in the photo, and denying any deals or requests for assistance with the prosecution in exchange for his testimony were all false.  He stated he did not see who was in the car or who shot him and Shauna Farrow, but that it could not have been Petitioner or Paris Powell because they were "innocent."

28.     Brad Miller testified that his first contact with Derrick Smith was before the preliminary hearing in Petitioner's and Paris Powell's case, and that Mr. Smith has never told him that he could not identify the people in the car from which the shots were fired. Although deals between a prosecutor and a witness in exchange for testimony were very normal, Mr. Miller stated that Mr. Smith told him he did not want a deal because he didn't want to be a "snitch."  According to Mr. Miller, Mr. Smith never asked him for any help, there was no deal when he put Mr. Smith on the stand, and there never was a deal with Mr. Smith for his testimony.

29.     To Brad Miller's knowledge, Mr. Smith was unaware of the letter Mr. Miller wrote to the Pardon and Parole Board immediately after Petitioner's trial requesting that it grant Mr. Smith pre-parole status.  Mr. Miller testified he was trying to help Mr. Smith because he respected him for testifying, and any such letter was not part of any deal for Mr.

Smith's testimony.  In his opinion, assistance of that nature need not be disclosed to the defense.

30.     On March 16, 2000, Derrick Smith was charged with trafficking in crack cocaine.  Although Mr. Miller was in private practice and no longer working as an assistant district attorney, he contacted the prosecuting attorney in the District Attorney's office and informed him that Mr. Smith had testified as a witness in two murder cases.

**Grounds for Relief**

As previously stated, the grounds for relief contained in Petitioner's Second Petition are related and intertwined, as they both require and rely on the same factual allegations of Derrick Smith's false testimony at trial and the existence of a deal or arrangement for assistance with the prosecutor in exchange for Mr. Smith's testimony.  Petitioner claims: (1) that his convictions were obtained upon evidence known by the prosecution to be false in violation of Napue and the Fourteenth Amendment, and (2) that additional suppression of exculpatory evidence rendered his convictions unconstitutional.

In Napue, the prosecuting attorney promised a key witness that if he testified against the defendant, a recommendation for a reduction of the witness's sentence would be made and, if possible, effectuated.  The witness's testimony was the primary identification testimony and extremely important due to eyewitness identification difficulties of other witnesses.  Based largely on this witness's testimony, the defendant was found guilty and sentenced to 199 years.  On cross-examination, the witness testified he had not been given

a reward or a promise of a reward for testifying.  On re-direct, the assistant state's attorney elicited the same false answer.

The Supreme Court first stated it was well established that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment."  Id. at 269 (citations omitted).  The same result occurs when the state, although not soliciting the false evidence, allows it to go uncorrected when it is presented.  Id.  This is true even if the false testimony goes only to the credibility of the witness, as the defendant's life or liberty may depend on something as subtle as the possible interest of the witness.  Id.

In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that suppression of favorable evidence by the prosecution after request by the accused violates due process, irrespective of the good faith or bad faith of the prosecution, where the evidence is material to either guilt or punishment.  Id. at 87.  That duty of disclosure was extended even when the accused had not made a request, United States v. Agurs, 427 U.S. 97, 107 (1976), and encompasses impeachment evidence as well as exculpatory evidence.  United States v. Bagley, 473 U.S. 667, 676 (1985).  The evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  Id. at 682.

In Kyles v. Whitley, 514 U.S. 419 (1995), the Supreme Court explained a prior holding that "favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence

12

been disclosed to the defense, the result of the proceeding would have been different.'" Id.

at 433 (quoting Bagley, 473 U.S. at 682). The Supreme Court emphasized four aspects of

materiality under Bagley. First, the touchstone of materiality is a "reasonable probability"

of a different result. The question is "whether in its absence [the defendant] received a fair

trial, understood as a trial resulting in a verdict worthy of confidence." Kyles, 514 U.S. at

434. Second, it is not a sufficiency of evidence test, but a showing "that the favorable

evidence could reasonably be taken to put the whole case in such a different light as to

undermine confidence in the verdict." Id. at 435. Third, "once a reviewing court applying

Bagley has found constitutional error there is no need for further harmless-error review." Id.

at 435. The fourth and final aspect of Bagley materiality "is its definition in terms of

suppressed evidence considered collectively, not item by item." Id. at 436.

In Strickler v. Greene, 527 U.S. 263 (1999), the Supreme Court explained the

standards and components of a Brady violation:

> There are three components of a true Brady violation: The evidence at
> issue must be favorable to the accused, either because it is exculpatory, or
> because it is impeaching; that evidence must have been suppressed by the
> State, either willfully or inadvertently; and prejudice must have ensued.

Id. at 281-82.

"[W]hen 'the reliability of a given witness may well be determinative of guilt or

innocence,' nondisclosure of evidence affecting credibility falls within [the] general rule [of

Brady]." Scott v. Mullin, 303 F.3d 1222, 1231 (10th Cir. 2002) (citations omitted).

"[I]mpeachment Brady material will only require a new trial 'if the false testimony

13

could . . . in any reasonable likelihood have affected the judgment of the jury.'"  Id. at 1232

(citation omitted).  "As we stressed in Kyles:  '[T]he adjective is important.  The question

is not whether the defendant would more likely than not have received a different verdict

with the evidence, but whether in its absence he received a fair trial, understood as a trial

resulting in a verdict worthy of confidence.'"  Strickler at 289-90 (quoting Kyles, 514 U. S.

at 434).

At trial, Derrick Smith testified that he saw a two-door gray hatchback approach and

stop, and the driver's side door open.  He then saw Petitioner, Paris Powell, and someone in

the back seat of the car shoot at Shauna Farrow and at him.  Douglas v. State, 1997 OK CR

79, ¶ 67, 951 P.2d 651, 672.  Mr. Smith was cross-examined extensively regarding his

identification testimony of Petitioner.  He was also questioned extensively by both

defendants' counsel and the prosecutor regarding whether he had made any deals or

agreements with the prosecutor in exchange for his testimony.  He testified on direct

examination he had not had any discussions with the prosecution about what should happen

in his own criminal case and that he had not received any special treatment:

> Q.   All right.  Mr. Smith, have you and I ever had any discussions about
>      what should happen with your case?
> A.   No, sir.
> Q.   Mr. Smith, as far as you know, have you received any special treatment
>      on the disposition of your case based on what you're here about today?
> A.   No, sir.
> Q.   Did you have a lawyer in that case?
> A.   Yes, sir.
> Q.   Do you remember his name?
> A.   Hurst Jones.
> Q.   Hurst Jones; is that right?

| A. | Yes. |
|---|---|
| Q. | And as far as you know, did Hurst Jones ever speak to anybody, me or anyone else handling this murder case, about your case? |
| A. | No, sir. |

* * *

| Q. | They just, whoever - - did I handle the case where you got the ten years? |
|---|---|
| A. | No, sir. |
| Q. | Did you ever see me come to court on your case at all? |
| A. | No, sir. |

* * *

| Q. | You've talked to me many times, haven't you? |
|---|---|
| A. | Yes, sir. |
| Q. | And what case do we talk about when you and I get together? |
| A. | We talk about this case right here, the murder case. |

(Tr., Vol. III, pp. 720-23.)

On cross-examination, Petitioner's trial counsel specifically inquired about any deal

with the prosecution or consideration in exchange for his testimony:

| Q. | Now isn't it true that after you testified at the preliminary hearing, a number of people asked you why you had done that and named Yancy? |
|---|---|
| A. | Yes. |
| Q. | And isn't it true, sir, that you told a number of people, both people that you were incarcerated with, and possibly some people on the street also, that you had testified - - that you had testified against Yancy - - let me back up - - that you had not really been sure that Yancy was in the car, but that you had to look after yourself and that - - and that I'm trying to get this right - - and that you or your lawyer had had a deal with the District Attorney's office that if you testified in this case against Yancy that you would receive a lesser charge than the trafficking? |
| A. | No, sir. |

* * *

| Q. | (By Mr. Kirk) Of course you did.  Now that plea bargain that you're talking about included the fact that you would testify in this case, didn't it? |
|---|---|
| A. | No, sir. |

15

Q.     Okay.  Now that's - - is this - - is this all the consideration you received for testifying in this case?

A.     I received nothing.  Just - - I was told on this case right here that I couldn't get no kind of deals on my case or nothing.  It was just that I handled this case, and then my lawyer would handle mine, with no deals, nothing.  No kind of deal was made.

* * *

Q.     You're aware, are you not, that the District Attorney's office is asked to write a letter, by the parole board, on each inmate that's coming up for parole, either approving, disproving [sic], or not commenting at all.  You're aware of that, aren't you?

A.     Yes.

Q.     Isn't it true that you expect the District Attorney's office to either write you an affirmative letter or not respond, which the parole board will take as an affirmative response as to parole?

A.     No, sir.

Q.     Mr. Smith, isn't it true that even the - - the consideration that you received in the trafficking case was not all the consideration you received, was it?

A.     Yes, that was all the consideration I was [sic] received by my lawyer.  I mean, didn't nobody make no deals.  That's what my lawyer got.  I plea bargained to that because I was scared to go to trial, to took [sic] it to trial.

(Tr., Vol. IV, pp. 847-51.)

On redirect, Derrick Smith testified he had never asked for any help with his own

criminal case:

Q.     (By Mr. Miller) Do you remember where it was that we first spoke?

A.     Yes, in your office.

Q.     Okay.  And at that time do you recall any discussion that we had or statement that I made to you about your own drug case that you had pending?

A.     Yes.

Q.     What did I tell you about your drug case?

       MR. KIRK:  If the Court please, Your Honor, it can't be anything but self-serving.

       THE COURT: Overruled.  You opened the door on this.  Go ahead.

16

Q.     (By Mr. Miller) Go ahead.
A.     You told me that at that time when we was talking, you told me that
        you couldn't help me with my case at all.  This is the only case that we
        could talk about right here, and you couldn't help me with my case
        because if you tried to help me with my case, then it would mess with
        this one.  So I didn't receive no help.
Q.     Did you ever even ask me to help you with your case?
A.     No, sir.
Q.     Okay.  And as far as you know, did your lawyer Hurst Jones ever even
        talk to me about your case?
A.     No, sir.
Q.     Did you ever see me in any court appearance in reference to your case?
A.     No, sir.
Q.     Now Mr. Kirk's tried to imply that somehow you got some special
        treatment for your case so that you would cooperate with us in this
        case.  You heard that, didn't you?
A.     Yes.
Q.     And I believe you told them that you didn't think that was the case at
        all, right?
A.     Yes.

 (Tr., Vol. IV, p. 867-69.)

        In the instant case, the key question is whether Petitioner has demonstrated that the

trial testimony of Derrick Smith was false.  The evidence presented at the evidentiary hearing

is insufficient to support Petitioner's claims of a deal in exchange for testimony, or that

Derrick Smith's testimony at Petitioner's trial was untruthful.  Although Derrick Smith now

states that he could not identify Petitioner as one of the shooters and that he testified falsely

in exchange for help and assistance from Brad Miller, this current version of his testimony

in reference to Petitioner's case is not supported by any evidence other than supposition and

innuendo extracted from post-trial actions of Brad Miller - many of which occurred years

after Petitioner's trial.

In addition to the contradictory nature of Derrick Smith's evidentiary hearing testimony, the Court finds the veracity of each of the primary witnesses who testified to be highly suspect. The Court must, therefore, primarily rely on the non-testimonial evidence presented at the evidentiary hearing, and compare it to the procedural history of the case and the testimony and evidence presented at trial, to determine whether support exists to substantiate Petitioner's claims. Mr. Smith was extensively questioned at trial by both the prosecutor and Petitioner's counsel regarding the existence of a deal or any requests for assistance in exchange for his testimony. No evidence, other than Mr. Smith's recent assertions, was submitted to contradict Mr. Smith's testimony in Petitioner's trial denying the existence of any deals.

Although Mr. Miller wrote a letter in support of Mr. Smith to the Pardon and Parole Board a day after Petitioner's trial, it provides little support for Petitioner's claims. The letter was not written until after Petitioner's trial and could not have been provided to defense counsel. The fact a letter was written was also not uncommon. As Petitioner's trial counsel observed on cross-examination of Mr. Smith, it was standard procedure for the District Attorney's office to write a letter for each inmate coming up for parole. (Tr., Vol. IV, p. 851.) Further, the letter stated that Mr. Miller and Mr. Smith did not have a deal in exchange for Mr. Smith's testimony, a statement consistent with Mr. Smith's trial testimony.

As to his other allegations of assistance, Petitioner has failed to overcome the length of time between his trial and the incidents asserted to connect and demonstrate that a deal existed between Mr. Smith and Mr. Miller for Mr. Smith's testimony in Petitioner's trial.

18

Any evidence presented at the evidentiary hearing pertaining to a request for assistance by Mr. Smith or potential help by Mr. Miller involved evidence of incidents beginning nearly two years after Petitioner's conviction and occurring immediately before and after Paris Powell's trial.

Andrea Laster and Jackie Laster also testified at the evidentiary hearing in support of Petitioner's claim that Mr. Miller coerced false testimony at trial regarding the identification of Petitioner in the car used in the shooting.  Andrea Laster testified at Petitioner's trial that she did not want to testify and had to be arrested and brought in by the police.  She identified the photograph of the bluish hatchback as the car in which she saw Petitioner a day before the shooting.  When questioned about being in custody or in jail during the trial, she testified that she and her sister weren't really in a jail, but that they were told by the police that they would go to jail if they did not testify.

At the evidentiary hearing, Andrea Laster stated she saw Petitioner at the park two nights before the shootings, and that the car in which she saw him was a dark, "box like car" - more like a "98 or Oldsmobile or something."  She stated that when she told Brad Miller that the photograph he showed them was not the car in which they had seen Petitioner, he threatened her and her sister with jail if they did not testify that it was the car and that they had also seen Petitioner that night with a gun.

Jackie Laster did not testify at Petitioner's trial, but testified at the evidentiary hearing that she and her sister Andrea were arrested and held in jail in an attempt to make them testify falsely.  She stated she told Brad Miller before trial that the photograph of the car he

showed them was not the car in which she saw Petitioner, and that she wasn't certain, but she believed she saw him at the park two days before the shootings.[2]

The Court finds little support for Petitioner's claims in this newest version of Andrea Laster's testimony, even when considered together with the testimony of her sister Jackie Laster.  The credibility of the witnesses regarding their identification of the car and of coercion by Brad Miller is questionable in light of several facts.  First, they are and have been friends of Petitioner for a considerable length of time, as he used to live with them. They are also related to Derrick Smith.  Further, they agreed, and the evidence demonstrates, that they were taken into custody during Petitioner's trial because of their failure to appear when subpoenaed to testify.  Additionally, Andrea Laster was questioned at trial extensively by attorneys for both the state and the defense as to whether she had been threatened or coerced by the prosecutor.  She testified that the prosecutor told her to tell the truth on more than one occasion, and that her testimony at trial was the truth.

More importantly, their latest testimony of the car's description and the alleged forced false trial testimony becomes highly suspect when considered with other witnesses' trial testimony.  Ebony Rhone, Ladana Milton, and Winter Milton all testified at Petitioner's trial that they were in the park on the night of the murder and saw Petitioner in a small blue car and carrying a weapon.  They identified the car in the photograph as the car in which they

---

[2] Jackie Laster testified at the evidentiary hearing that the description of the car contained in her affidavit as "dark black with little black baffles in the back" was not her words and that she did not know what "baffles" were.

saw Petitioner.  Lawrence Kuykendoll testified that Petitioner brought Paris Powell to his home in the early morning hours on the day of the shootings because Mr. Powell had been shot in the hand.  Mr. Kuykendoll took Mr. Powell to the hospital and then witnessed Petitioner leave in a bluish two-door hatchback car.  Leon Washington owned a body shop and sold cars.  He testified at Petitioner's trial that he knew Paris Powell, and that on the day after Powell was in the hospital, Petitioner brought in a car that used to belong to Mr. Washington.  Mr. Washington identified the car in the photograph as the car brought in by Petitioner.

The Court recognizes that "[r]eview of a death sentence is among the most serious examination any court of law ever undertakes." Brecheen v. Reynolds, 41 F.3d 1343, 1370 (10th Cir. 1994).  The Court is cognizant that Derrick Smith's identification of Petitioner was the linchpin to a conviction.  Petitioner has not, however, presented sufficient facts to raise a serious question about the use and suppression of false evidence by the state or regarding the existence of a deal in exchange for Mr. Smith's or Andrea Laster's testimony at Petitioner's trial.  Under the facts presented by Petitioner, the Court finds there is no reasonable probability of a different result, and that Petitioner's trial resulted in a verdict worthy of confidence.

After a complete and thorough review of the transcripts, trial record, appellate record, record on post-conviction, the supplemental briefs filed by the Petitioner and Respondent, the applicable law, and the testimony and evidence presented at the evidentiary hearing, the Court finds that Petitioner's *Second Petition for Writ of Habeas Corpus Under 28 U.S.C.*

*§ 2254 By a Person in State Custody* should be and hereby is DENIED.  Any remaining

motions are moot.

IT IS SO ORDERED this 31st day of January, 2006.




ROBIN J. CAUTHRON
United States District Judge